IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SYLVESTER GRIFFIN,

                Petitioner,

vs.

DEBBIE ASUNICON,[1]

                Respondent.

No. 2:16-cv-01835-JKS

MEMORANDUM DECISION

Sylvester Griffin, a state prisoner now represented by counsel, filed a Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254. Griffin is in the custody of the California Department of Corrections and Rehabilitation and incarcerated at California State Prison, Los Angeles County. Respondent has answered, and Griffin has replied.

## I. BACKGROUND/PRIOR PROCEEDINGS

On January 25, 2011, Griffin was charged with four felonies: murder (Count 1); rape (Count 2); first-degree burglary (Count 3); and first-degree robbery (Count 4). The information alleged that Griffin, a former medical transport driver, had raped and murdered Alice Murphy, a 64-year-old resident of a Folsom housing complex where Griffin had provided medical transport for the victim's neighbor. The information further alleged that, in the commission of the murder, Griffin personally used a deadly weapon (a pillow and/or pillowcase) and, as special circumstances in connection with Count 1, that the murder had been committed in the commission of burglary, rape, and robbery. Griffin pled not guilty to the charges and denied the special allegations.

---

[1]      The correct spelling of Respondent's name is Debbie Asuncion.

Prior to trial, Griffin moved to exclude testimony of all DNA test results for which no statistical analysis was performed (i.e., evidence that some samples contained partial profiles with alleles consistent with Griffin's DNA profile). After holding a hearing on the motion, the trial court denied it, stating:

> [T]he relevance of items must be viewed in the context of the entire case. Numerous items of evidence yield [Griffin's] full profile with the corresponding statistical probability, and in this case numerous items yielded a match with other items containing alleles consistent with [Griffin's] profile.
>
> The court finds that the presence of identifiable alleles and partial profile results cannot be viewed in a vacuum given the other conclusive findings. Statistics from samples taken from the victim and crime scene were calculated in this case and will be presented to the jury. Numerous other samples were taken in this case, and the jury certainly has the right to hear the results of those samplings. To hold otherwise would leave the jury with the unfair impression that law enforcement was not diligent or competent in their collection of other samples from logical locations and items of evidence.
>
> The number and identification of alleles on DNA samples from the victim and from items of evidence at the crime scene are part of the totality of the evidence, which does include statistical information. The court finds these and partial profiles from [Griffin] and [the] victim located from the crime scene on similar articles to be meaningful, relevant and corroborative of full profiles from [Griffin] and [the] victim.

Two days later, a jury was empaneled to hear the case. At the conclusion of jury selection, the court referred to the anticipated trial schedule and explained that there would be no trial on Fridays. The court further stated that there would be no trial from Wednesday, March 28 through April 6. The record does not indicate a reason for the scheduled break, and it does not appear from the record that defense counsel objected. At the conclusion of proceedings on March 22, the trial court informed the jury that, because the prosecution had gone through several witnesses faster than anticipated, there also would be no trial on March 26 and 27. The trial resumed two weeks later, representing a total recess of eight court days (eighteen calendar days).

At the conclusion of trial, the jury found Griffin guilty of murder committed during rape and burglary and also found true the personal use of a deadly weapon allegation. The jury found him not guilty of robbery. The trial court sentenced Griffin to life without the possibility of parole ("LWOP") for the murder committed during rape and burglary, plus one year for the personal use of a deadly weapon. The court stayed the sentence on the rape and burglary counts under California Penal Code § 654.[2]

Through counsel, Griffin appealed his conviction, arguing that: 1) the trial court erred by denying his request for a full evidentiary hearing, under the first *Kelly*[3] prong, regarding the reliability of mixed-sample DNA evidence; 2) the trial court abused its discretion in allowing testimony that alleles in some of the mixed-source DNA samples were consistent with Griffin's DNA profile; 3) the trial court abused its discretion in finding that the prosecution's DNA analyst followed generally-accepted procedures; 4) he was prejudiced by the two-week recess in the trial; 5) the *corpus delicti* instruction impermissibly lowered the prosecution's burden of proof; and 6) the trial court erred in instructing the jury that the evidence need not show the actual date of the crimes. In considering this case on direct appeal, the California Court of Appeal laid out the following facts underlying the evidence presented at trial:

---

[2]     Section 654 provides in relevant part that "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." CAL. PENAL CODE § 654.

[3]     *See People v. Kelly*, 549 P.2d 1240 (Cal. 1976), superceded by statute as stated in *People v. Wilkinson*, 94 P.3d 551 (Cal. 2004). In *Kelly*, the California Supreme Court held that "evidence obtained through a new scientific technique may be admitted only after its reliability has been established under a three-pronged test. The first prong requires proof that the technique is generally accepted as reliable in the relevant scientific community." *People v. Bolden*, 58 P.3d 931, 949 (Cal. 2011).

The victim and her cat lived in the Mercy Senior Housing Complex in Folsom. She had a habit of leaving her front door unlocked and sometimes ajar, even at night, so the cat could come and go. At the time of her death a few days before Christmas 2009, the victim was still recovering from a neck injury for which she wore a cervical collar.

In 2009, [Griffin] worked as a driver for Rapid Response medical transport company. One of his clients was the victim's neighbor, Constance Blassingame, who lived two doors away from the victim. Twice a week [Griffin] arrived around 5:00 a.m., parked, and walked past the victim's apartment to Ms. Blassingame's door. This service ended in early November 2009.

On Saturday, December 19, 2009, the victim spent the day with her friend, Tamara O'Reilly. O'Reilly recalled dropping the victim home around 9:00 p.m. and later receiving a message that the victim had called, but no one answered the phone when O'Reilly called back Sunday morning around 11:00 a.m. A police detective testified O'Reilly told him she tried to call the victim Saturday night but no one answered. The victim's computer was turned on at 8:09 p.m. and off at 10:50 p.m. on Saturday.

On Monday, December 21, 2009, at about 11:50 a.m., O'Reilly arrived at the victim's home for a planned visit. The door was wide open. A couple of newspapers were on the front porch. The victim's body was on her bed with a pillowcase spread over her face. She was pronounced dead at the scene. Her purse was missing and was not recovered. Police pursued a lead that a transient had been seen with a purse but were able to exclude that person.

DNA analysis of semen at the crime scene yielded a cold hit on a DNA database, pointing to [Griffin]. In the trial court and on appeal, [Griffin] does not dispute that DNA evidence of his semen was at the crime scene.

The cause of death was homicidal asphyxia, atypical because the neck and hyoid bone were not fractured. The coroner opined there was neck compression as a result of pressure combined with the cervical collar against her neck, as well as possible smothering, covering the nose and mouth. The victim had bruises and abrasions to her face and pinpoint hemorrhages consistent with asphyxiation. She had two fractured ribs and bruising to her chest, abdomen, vagina, arms, and legs. Bruises on the inside of her thighs were consistent with sexual assault. The coroner resisted defense counsel's attempts to elicit an opinion that the state of the sperm indicated the sex occurred three to five days earlier. She could not say when the sex occurred.

As to the time of death, the coroner, who saw the body at the scene on Tuesday, December 22nd, at 2:00 a.m., opined the victim "had died very recently, meaning, within the past 24 hours. It could have been longer. It could have been shorter, but based on the observations of the lividity and rigidity, that seemed relatively reasonable." The coroner clarified, "It could have been more than 24 hours. It could have been 36 hours." This would put the time of death as early as 2:00 p.m. Sunday, December 20, 2009.

Employment records show defendant worked Saturday, December 19, 2009, with his first pick-up at 4:40 a.m. and his last assignment at 5:12 p.m. He did not work Sunday, December 20th. He worked Monday, December 21st, with his first pick-up at 6:10 a.m. and his last at 4:13 p.m. [Griffin's] supervisor, who also rented [Griffin] a room in her home, testified [Griffin] phoned her on Saturday, December 19th and said he

would not be home that night because he was going to Stockton to see his cousin, whose house had been robbed. He did not come home Sunday, and she did not see him again until Monday, December 21st, at work.

Police canvassed the victim's neighbors. Neighbor Steven Scribner, whose DNA was not found at the crime scene, said he and the victim planned to watch a football game on Sunday, December 20th, but no one answered when he knocked on her door, which was closed tight. He later phoned but no one answered. The timing was uncertain. Scribner told police he knocked and phoned Sunday around 1:30 p.m. Scribner was unavailable as a witness, but the jury saw his "Skyped" conditional examination taken a year after the murder, in which he said he phoned around 11:30 a.m. and went to her door around a half hour later and again about a half hour later.

Ms. Blassingame testified that when she left for an appointment that Monday morning, the victim's door was closed, as it had been for several days, and when Blassingame returned home around 10:00 or 10:30 a.m., the victim's door was closed and "It was swarming with police." Or perhaps she saw the police when she later went out again.

After the DNA analysis of semen at the crime scene indicated a match with [Griffin's] DNA profile, the police located him in his home state of South Carolina, where he had moved about a month after the murder, ostensibly to care for sick parents. Police tape-recorded a phone conversation, played for the jury, in which [Griffin] denied knowing the victim but agreed to look at a photograph. After receiving the emailed photo, [Griffin] phoned police and left a message that he did not recognize the victim.

After his arrest, [Griffin] told police in a tape-recorded interview, played for the jury, that the victim was probably a neighbor lady who once asked for help corralling her cat as [Griffin] waited for his transport client. He helped the lady get the cat. She invited him into her kitchen and gave him juice. He was there about five or 10 minutes and never entered the bedroom. When told there was evidence he was in the bedroom, he said he did not recall being in the bedroom, and he denied having sex with the victim.

In the trial court, [Griffin] objected to some, but not all, of the DNA evidence, without specification by item. [Griffin] did not object to some of the DNA evidence that his sperm was found at the crime scene, and on appeal he says he does not dispute that his DNA was on the victim's underwear, towel, and bed sheet.

In the trial court, [Griffin] did object to other DNA evidence (partial profiles or low-level minor-donor profiles from low-level mixed samples). At an Evidence Code section 402 hearing, the prosecution's DNA expert Michelle Chao testified to analysis of (1) sperm fractions in biologic evidence and (2) nonsperm mixed samples from more than one source, e.g., sweat, saliva, nose mucous and vaginal secretions. The trial court ruled the DNA evidence admissible.

Chao testified to the jury that she performed DNA testing on swabs from the victim's body, pillow case, bed sheets, towels, underpants, and carpet. Chao was able to obtain full DNA profiles in some samples from the victim's left breast, inner thigh, underwear, sheet, and towel. They were the same as [Griffin's] DNA profile, estimated to occur at random among unrelated individuals in approximately one in multiple quadrillions or sextillions (depending on the particular item tested) of the African

American population which includes [Griffin], one in 680 sextillion of the Caucasian population and one in 32 septillion of the Hispanic population.

Partial profiles of the sperm and nonsperm fractions of other samples, including those taken from the victim's body, were consistent with [Griffin's] DNA profile.

"Foreign" DNA material not belonging to the victim or [Griffin] was detected in some samples from the vaginal and thigh swabs and cuttings from the towel and bed sheet. Testing of five samples, all of which had a full profile on the sperm fraction, indicated a foreign allele at one locus (a number 16 allele on the eighth chromosome) that was not consistent with the victim's profile. Chao determined it could be a minor contributor who has a 16 allele or it could be a product of, or inherent to the sperm fraction, meaning it could be "elevated stutter"—which occurs when an allele breaks apart during testing and is detected as a separate, smaller allele—that didn't get filtered out.

Scrapings from under the victim's fingernails revealed only the victim's DNA, except for one scraping with an extra allele that was not consistent with [Griffin's] profile. Clippings of the victim's fingernails revealed only the victim's DNA.

One spot of blood on the carpet contained the victim's DNA profile, plus an additional allele not consistent with [Griffin's] profile. Chao said it could have been deposited by anyone walking barefoot on the carpet at any time.

[Griffin] testified at trial. He was 41 years old at the time of the charged crimes. He admitted he abused drugs over the years and had prior convictions for grand theft in 1994, possession of cocaine with intent to distribute in 1995, and bank robbery in 1997. As he waited for Ms. Blassingame one day, the victim approached and asked for his help in retrieving her cat. He helped. She invited him in, wanted him to stay, and invited him to come back sometime. Yet they never exchanged phone numbers. He returned three times, because he was lonely and unable to reconcile with his wife. The first time, the victim said to come back after dark to avoid being seen by the neighbors. The second time, they drank alcohol, talked, and had sex. The third and last time was Saturday, December 19, 2009, around 9:00 or 10:00 p.m. They talked about their children and then had sex in the victim's bedroom. [Griffin] testified he left the victim, alive and well, around midnight or 1:00 a.m. Sunday morning, went home, and stayed there all day Sunday watching football on television. He sometimes rented a motel room to get away from the noisy children in the house where he rented a room. So as not to hurt the mother's feelings, he told her he was going to Stockton one day in early December, but that was just an excuse for spending the night at a motel.

[Griffin] claimed he was unaware of the victim's killing when he left California a month later, to be closer to his ailing parents in South Carolina. He heard on the news of the murder at the housing complex but did not think the women he had sex with could have been murdered. He recognized her in the emailed photo but lied because he did not think he could help the investigation. He withheld the fact he had sex with her because they had promised to keep their relationship "discreet."

[Griffin] testified he had nothing to do with the charged crimes.

[Griffin's] mother, his wife, his ex-wife, and his friend testified to their opinion that [Griffin] is not violent or angry towards women, despite his drug use.

Defense witness Zena Dougherty, who lived in the housing complex, testified she brought a can of cat food to the victim's door on Sunday around 12:30 or 1:00 p.m., and knocked. The door opened a few inches; a hand reached out and took the can; and the door closed. Dougherty did not recall telling police that the victim came outside and talked with her. Dougherty has had memory problems since she fell after speaking with the police.

Prosecution rebuttal witness, Police Detective Jonathan Lasater, testified Dougherty told him on Tuesday, December 22, 2009, that she brought a can of cat food to the victim around noon on Monday, December 21st, and they spoke on the doorstep for 10 to 15 minutes. When the detective reminded Dougherty that the victim was already dead by then, Dougherty said it must have been Sunday but that did not make sense either, because she feeds her cat much earlier on Sundays before she leaves for church.

*People v. Griffin*, No. C071140, 2015 WL 5460697, at *1-4 (Cal. Ct. App. Sept. 18, 2015).

The Court of Appeal unanimously affirmed the judgment against Griffin in a reasoned, unpublished opinion issued on September 18, 2015. *Id.* at *12. Griffin petitioned the California Supreme Court for review, which was summarily denied on December 16, 2015.

Griffin timely filed a *pro se* Petition for a Writ of Habeas Corpus to this Court on July 24, 2016. Docket No. 1 ("Petition"); *see* 28 U.S.C. § 2244(d)(1)(A). This Court, through a previously-assigned magistrate judge, determined that, in light of the complexity of the legal issues involved, the interests of justice required appointment of counsel, and appointed counsel for Griffin. Docket No. 6. Respondent has answered the petition, Docket No. 16, and Griffin has filed a counseled Traverse, Docket No. 18. The case is now before the undersigned judge and ripe for adjudication.

## II. GROUNDS RAISED

In his Petition before this Court, Griffin raises the same arguments he raised to the state courts on direct appeal, namely that: 1) the trial court erred by denying his request for a full *Kelly* evidentiary hearing regarding the reliability of mixed-sample DNA evidence; 2) the trial

court abused its discretion in allowing testimony that alleles in some of the mixed-source DNA samples were consistent with Griffin's DNA profile; 3) the trial court abused its discretion in finding that the prosecution's DNA analyst followed generally-accepted procedures; 4) he was prejudiced by the two-week recess in the trial; 5) the *corpus delicti* instruction impermissibly lowered the prosecution's burden of proof; and 6) the trial court erred in instructing the jury that the evidence need not show the actual date of the crimes.

### III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision." *Id.* at 412. The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002). Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it

cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"
*Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). A summary denial is an adjudication on the merits and entitled to deference. *Harrington v. Richter*, 562 U.S. 86, 99 (2011). Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

## IV. DISCUSSION

**A.      *Challenges to DNA Evidence* (Grounds 1-3)**

In the first three grounds for relief, Griffin challenges the admission of certain DNA evidence on the following grounds: 1) the trial court should have conducted a *Kelly* hearing regarding the reliability of mixed-sample testing**;** 2) the prosecution's expert did not calculate random match probability statistics; and 3) the prosecution failed to show that standard protocols and procedures for analysis and interpretation of the evidence were followed.

Griffin's state-law-based claims, however, are not cognizable on federal habeas review. The Supreme Court has made clear that federal habeas power does not allow granting relief on the basis of a belief that the state trial court incorrectly interpreted the state evidence code in ruling on the admissibility of evidence. *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (citing *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  In this context, the Supreme Court has defined the category of infractions that violate fundamental fairness very narrowly, limiting them to specific guarantees enumerated in the bill of rights.  *Estelle*, 502 U.S. at 73 (citing *Dowling v. United States*, 493 U.S. 342, 352 (1990)).  Indeed, the Supreme Court has acknowledged its "traditional reluctance to impose constitutional restraints on ordinary evidentiary rulings by state trial courts." *Crane v. Kentucky*, 476 U.S. 683, 689 (1986).  In criminal actions, "[t]he States are free to provide such procedures as they choose, including rules of evidence, provided that none of them infringes a guarantee in the Federal Constitution." *Burgett v. Texas*, 389 U.S. 109, 113-14 (1967).

Moreover, Griffin cannot show that the admission violates federal due process. In support of his direct appeal claim, Griffin relied on *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993), in which the U.S. Supreme Court held that Rule 702 of the Federal Rules of Evidence ("FRE") requires district judges to be gatekeepers for proposed scientific evidence by assuring "that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Accordingly, an expert's testimony under FRE 702 must be based on scientific knowledge that is grounded "in the methods and procedures of science," and consists of more than just "subjective belief or unsupported speculation." *Id.* at 590-91. *Daubert*, however, states a non-constitutional evidentiary rule that applies in the federal trial courts and is not binding on state courts. *See Dowling v. United States*, 493 U.S. 342, 352-53 (1990) (noting that Federal Rules of Evidence constitute "nonconstitutional source[ ]"); *cf. Runningeagle v. Ryan*, 686 F.3d 758, 776-77 (9th Cir. 2012) (noting that Federal Rules of Criminal Procedure not binding on state courts because not constitutionally based). Accordingly, it provides no basis for habeas relief.

Errors in testing go to the weight, and not the admissibility, of evidence. As the California Supreme Court has explained:

> [T]he *Kelly/Frye* rule tests the fundamental validity of a new scientific methodology, not the degree of professionalism with which it is applied. [Citation.] Careless testing affects the weight of the evidence and not its admissibility, and must be attacked on cross-examination or by other expert testimony.' [Citation]."

*People v. Cooper*, 809 P.2d 865, 888 (1991) (alterations in original; citations omitted). The same is true in the federal system. *See generally Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.");

*see also United States v. Hicks*, 103 F.3d 837, 846 (9th Cir. 1996), *overruled on other grounds by United States v. Grace*, 526 F.3d 499, 503 (9th Cir. 2008); *United States v. Goodrich*, 739 F.3d 1091, 1098 (8th Cir. 2014). Griffin does not contend that he was precluded from cross-examining the State's expert or obtaining his own DNA expert.

Furthermore, these evidentiary error claims fail because the Court of Appeal's harmless determination is reasonable in light of the properly-admitted and unchallenged DNA evidence against Griffin.[4] *See Brecht v. Abrahamson*, 507 U.S. 619, 622, 629 (1993) (harmless error standard applies to evidentiary errors). In rejecting Griffin's challenges to certain of the DNA evidence on direct appeal, the Court of Appeal declined to address the merits of Griffin's claims and alternatively concluded that, even if the trial court erred in admitting certain of the DNA evidence, Griffin failed to show prejudice from the additional DNA evidence. The appellate court reasoned:

> Here, [Griffin] claims the challenged DNA evidence was the "only" evidence supporting the state's case. Not so. The unchallenged DNA evidence supported the state's case. That [Griffin] claimed consensual sex did not strip the unchallenged DNA evidence of its value in proving [Griffin] was the perpetrator of the charged crimes.
> Under the heading arguing that inability to calculate statistical probabilities rendered some of the DNA evidence inadmissible, [Griffin] argues he was prejudiced because admission of the evidence complicated the defense by requiring defense counsel to make an extremely technical argument as to why the evidence was unreliable. Although it does not appear [Griffin] sought to exclude the evidence on the grounds of

---

[4] Other courts have admonished that harmless error review should not be confused with the sufficiency of the evidence inquiry required under *Jackson v. Virginia*, 443 U.S. 307, 324 (1979). *See, e.g.*, *Jensen v. Clements*, 800 F.3d 892, 902 (7th Cir. Sept. 8, 2015) ("Time and time again, the Supreme Court has emphasized that a harmless-error inquiry is not the same as a review for whether there was sufficient evidence at trial to support a verdict."). The Court's reliance on the properly-admitted DNA evidence against Griffin in finding any error harmless does not simply focus on the sufficiency of the other evidence, but rather properly "look[s] at the influence the improperly admitted [evidence] had on the verdict," in light of a "host of factors," including the overall strength of the prosecution's case. *Id.* at 904 (citations omitted).

time consumption or juror confusion, the trial court in ruling the DNA evidence admissible stated it had weighed probative value against prejudicial effect under Evidence Code section 352. However, the utility of [Griffin's] partial attack on DNA evidence at trial eludes us, unless perhaps the defense hoped to confuse the jury. In any event, we see no prejudice from [Griffin] responding to the challenged evidence. The DNA expert's entire testimony consumed only one day plus one hour of trial time, not an inordinate amount of time for DNA evidence.

In his opening brief, [Griffin] concludes his prejudice argument by saying "the DNA evidence discussed here—including (1) the statistics for the sperm fraction profile from the vaginal swab[,] (2) any remaining profiles found on the vaginal swab and (3) the non-sperm evidence—should not have been admitted in this case. In connection with the non-sperm DNA evidence and for the reasons discussed [regarding absence of statistics], the admission of the improper evidence cannot be found harmless. And the prejudice was exacerbated here by the improper admission of the DNA profiles interpreted from the vaginal swab and the highly incriminating statistics attributed to that evidence. In light of the conceded presence of DNA evidence which did *not* match either [Griffin] or [the victim], the improper admission of substantial DNA evidence cannot be found harmless under any standard. Reversal is required." (Orig. italics.) [Griffin's] reply brief says that, although the unchallenged evidence derived from [Griffin's] semen was consistent with the defense theory that he had consensual sex with the victim a day or a day-and-a-half before her death, the defense theory "became substantially more complicated in the face of the additional DNA evidence for which no statistics was offered. Thus, counsel had to explain that the expert's opinion that the evidence was 'consistent with' [Griffin's] profile required ignoring *additional* DNA left by the actual perpetrator . . . . Of course, had the statistical analysis been performed, the jury could have been told the degree to which such evidence was consistent with [Griffin] *as compared* to an unknown third party." (Orig. italics.)

However, testimony about the challenged evidence being consistent with [Griffin] did not require ignoring the evidence of a "foreign [donor]." Moreover, [Griffin] oversells the value of the "foreign [donor]" evidence. Much of it was possibly explained as "elevated stutter." Moreover, its presence was minimal and, as the prosecutor argued to the jury, traces of foreign DNA are to be expected in nonsanitized environments and, had the killer been someone other than [Griffin], much more foreign donor DNA should have been present at the crime scene, despite [Griffin's] theory that this phantom wore gloves.

[Griffin's] reply brief claims the challenged DNA evidence was critical to the prosecution's case because the prosecutor argued to the jury that the sheer volume of the samples proved her case. However, what [Griffin] cites is the prosecutor's rebuttal to defense counsel's suggestion that the prosecution had to prove the absence of foreign DNA. The prosecutor told the jury that traces of foreign DNA are to be expected in a nonsanitized environment, and the tiny trace alleles on the small number of items in this case was inconsequential, given "all the profiles that you saw on this visualizer and all the items and all the cuttings and all the swabs . . . ." Thus, the prosecutor's point was

that, if the killer were someone other than [Griffin], that person would have left much more DNA than the few samples found.

In his reply brief, [Griffin] argues "the question is whether, absent the improperly admitted DNA evidence, a single juror could reasonably find that the sperm sample evidence—which was explained by the defense—proved beyond a reasonable doubt that [Griffin] committed the crime, especially in light of DNA evidence found which according to the state's own expert was inconsistent with [Griffin]." However, [Griffin] cites no authority that we should disregard the unchallenged DNA evidence in assessing the prejudicial effect of challenged evidence. That [Griffin] admitted having sex with the victim does not render unduly prejudicial the additional DNA evidence of [Griffin's] presence at the crime scene.

We conclude [Griffin] fails to show prejudicial error warranting reversal based on the DNA evidence.

*Griffin*, 2015 WL 5460697, at *5-6.

An independent review of the record reflects that the appellate court's harmless determination is neither unreasonable or in contravention of Federal law. Griffin is thus not entitled to relief on any argument advanced in support of these grounds.

## B.    *Mid-Trial Recess* (Ground 4)

Griffin additionally argues that a recess of his trial for 18 calendar days (8 court days) in the midst of the prosecution's case-in-chief violated his due process rights. In considering this claim on direct appeal, the Court of Appeal laid out the following background:

[Griffin] expects us to assume it was the prosecutor who wanted the recess, but the record does not disclose who proposed the recess or why. Instead, the record indicates everyone agreed to the majority of it (six court days) before jury selection. The trial court stated on the record on February 29, 2012, that the court and counsel had worked out the schedule in chambers, and the tentative schedule was for jury selection to commence March 13th, opening statements on March 19th, "and there is a short time period that we will be dark. That's the last two [court] days of March [Wednesday March 28th and Thursday March 29th, with no trial on Fridays] and the first week of April [.]" Before opening statements, the court on March 14th informed the jurors of this anticipated schedule.

At the end of the day on Thursday, March 22nd, after the prosecution presented the testimony of [Griffin's] former supervisor and housemate, the court informed the jury: "[W]e have moved through the witnesses that we—some of the witnesses that we thought might be coming in early next week. [¶] So we have had somewhat of a change.

14

So the calendar you have, you can cross off next Monday and Tuesday [March 26 and 27]. So you're not coming back on the 26th and the 27th. Mark that through on the calendar that you received. [¶] You're going to be coming back on April 9th. So that's the Monday right after Easter, at 9 o'clock[.]"

Outside the jury's presence, the court noted that, pursuant to an informal agreement, it would meet with counsel on Monday March 26th to go over the jury instructions.

[Griffin] did not object to the recess.

When trial resumed on Monday, April 9th, the prosecution called as its next witness, the DNA analyst Michelle Chao. She testified for the full day plus an hour on the following day. The prosecution called a final, brief witness from the crime lab. The defense presented its entire case on Wednesday, April 11th, and the prosecution called a rebuttal witness that day. The jury heard closing arguments on Monday, April 16, 2012.

*Griffin*, 2015 WL 5460697, at *6-7.

As an initial matter, the Court of Appeal rejected this claim due to a failure to object at trial. *Id.* at 7-8. Consequently, because the state appellate court found Griffin's claim forfeited under California's contemporaneous objection rule, the claim is procedurally defaulted from federal habeas review. *Coleman*, 501 U.S. at 729-30 (a federal court will not review a claim if the state court's rejection of the claim rests on a state law ground that is independent of the federal question and adequate to support the judgment). The Ninth Circuit has repeatedly recognized and applied the California contemporaneous objection rule in affirming denial of a federal habeas petition on grounds of procedural default where there was a complete failure to object at trial. *See, e.g.*, *Inthavong v. Lamarque*, 420 F.3d 1055, 1058 (9th Cir. 2005); *Paulino v. Castro*, 371 F.3d 1083, 1092-93 (9th Cir. 2004).

Moreover, Griffin fails to show that his due process rights were violated by the continuance. In support of his claim, Griffin relies on *People v. Santamaria*, 280 Cal. Rptr. 43 (Cal. Ct. App. 1991), in which the California Court of Appeal held that a trial court abused its discretion by adjourning for 11 days after the jury's second day of deliberations because there

was a viable alternative to the judge's absence, namely, the use of a substitute judge. But again, federal habeas relief is not available for violations of state law. Although the Ninth Circuit has suggested that an abuse of discretion may also amount to a constitutional violation, *see Schell v. Witek*, 218 F.3d 1017, 1025 (9th Cir. 2000) (en banc), the Supreme Court has never held that abuse of discretion is an appropriate basis for granting federal habeas relief.[5] Indeed, quite to the contrary, the Supreme Court has strongly suggested that, while abuse of discretion is an appropriate standard on direct review, in a federal habeas proceeding it is not. *Renico v. Lett*, 559 U.S. 766, 772-73 (2010) ("It is not even whether it was an abuse of discretion for her to have done so–the applicable standard on direct review. The question under AEDPA is instead whether the determination of the Michigan Supreme Court that there was no abuse of discretion was "an unreasonable application of . . . clearly established Federal law."" (quoting § 2254(d)(1))).

Moreover, federal courts have determined that trial courts acted within their discretion in allowing mid-trial recesses of 24 and 32 days, respectively. *See United States v. Thomas*, 451 F.3d 543, 547 (8th Cir. 2006); *United States v. Smith*, 44 F.3d 1259, 1267-68 (4th Cir. 1995). There is simply no support in federal cases, much less clearly-established authority of the U.S. Supreme Court, that mandates that a delay of the type experienced in this case, without more, warrants habeas relief. In the absence of such authority, Griffin's claim must fail.

---

[5]     At one time, the Ninth Circuit viewed a state court ruling to be "objectively unreasonable" if it amounted to a clear error. *Van Tran v. Lindsey*, 212 F.3d 1143, 1152-54 (9th Cir. 2000). This is the test the Ninth Circuit uses in reviewing a trial court decision under the abuse of discretion standard. *United States v. Ressam*, 679 F.3d 1069, 1086 (9th Cir. 2012) (en banc). The Supreme Court noted *Van Tran's* statement of the test and expressly rejected it as inappropriate under the AEDPA. *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003) (clear error standard is insufficiently deferential to state courts).

C.     *Instructional Errors* (Grounds 5, 6)

Finally, Griffin alleges that the trial court made two errors in instructing the jury.

Because jury instructions in state trial are typically matters of state law, federal courts are bound

by a state appellate court's determination that a jury instruction was not warranted under state

law.  *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (noting that the Supreme Court has

repeatedly held that "a state court's interpretation of state law, including one announced on

direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *see

also Williams v. Calderon*, 52 F.3d 1465, 1480-81 (9th Cir. 1995).  An instructional error,

therefore, "does not alone raise a ground cognizable in a federal habeas proceeding."

*Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1986) (citation omitted).

A challenged instruction violates the federal constitution if there is a "reasonable

likelihood that the jury has applied the challenged instruction in a way that prevents the

consideration of constitutionally relevant evidence."  *Boyde v. California*, 494 U.S. 370, 380

(1990).  The question is whether the instruction, when read in the context of the jury charges as a

whole, is sufficiently erroneous to violate the Fourteenth Amendment.  *Francis v. Franklin*, 471

U.S. 307, 309 (1985).  This Court must also assume in the absence of evidence to the contrary

that the jury followed those instructions.  *Weeks v. Angelone*, 528 U.S. 225, 234 (2000);

*Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the

law that jurors follow their instructions"); *see Francis*, 471 U.S. at 323-24 & n.9 (discussing the

subject in depth).

It is well-established that not only must the challenged instruction be erroneous but it

must violate some constitutional right, and it may not be judged in artificial isolation but must be

considered in the context of the instructions as a whole and the trial record. *Estelle*, 502 U.S. at 72. This Court must also bear in mind that the Supreme Court has admonished that the inquiry is whether there is a reasonable likelihood that the jury applied the challenged instruction in a way that violates the constitution and that the category of infractions that violate "fundamental fairness" is very narrowly drawn. *Id.* at 72-73. "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process clause has limited operation." *Id.*

1. *CALCRIM No. 359–Corpus Delecti*

The trial court gave the following *corpus delecti* instruction to the jury pursuant to CALCRIM No. 359:

> "The defendant may not be convicted of any crime based on his out-of-court statements alone. You may only rely on the defendant's out-of-court statements to convict him if you conclude that other evidence shows that the charged crime was committed.

> "That other evidence may be slight and need only be enough to support a reasonable inference that a crime was committed.

> *"The identity of the person who committed the crime and the degree of the crime may be proved by the defendant's statement alone.* [Italics added.]

> "You may not convict the defendant unless the People have proved his guilt beyond a reasonable doubt."

Thus, although CALCRIM No. 359 prohibits reliance on a defendant's inculpatory out-of-court statements alone as proof that a crime occurred, it allows reliance on such statements to prove identity as the perpetrator.

While Griffin did not make any inculpatory out-of-court statements, he contends that the jury may have found inculpatory his initial lies to police that he did not know the victim. Griffin further contends that, because identity was the central issue in his case, the *corpus delecti*

18

instruction impermissibly lowered the prosecution's burden to prove identity beyond a

reasonable doubt.  The Court of Appeal considered and rejected this claim as follows:

> [Griffin] argues it is reasonably likely the jury understood the challenged
> instruction to mean the prosecution did not have to prove beyond a reasonable doubt that
> defendant was the perpetrator.  [Griffin] says his out-of-court statements did not admit
> guilt but at most showed he lied to the police about not knowing the victim.  [Griffin]
> says the instruction told the jury these statements could prove his identity as the assailant.
> He points out the prosecutor in closing argument called [Griffin] a liar, said [Griffin] lied
> to the police more than 25 times, told the jury "you have his statement" and nothing
> indicated someone else raped and killed the victim.  In rebuttal, the prosecutor told the
> jury, "Ask yourself if that man right there has convinced you of an alibi, the liar that he is
> . . . [did] he really [have] an alibi?"  According to [Griffin], the "infirmity" of the
> instruction was not "cure[d]" by the instruction that the jurors could not convict [Griffin]
> "unless the People have proved his guilt beyond a reasonable doubt," because the
> disputed instruction told them [Griffin's] own statements were proof against him.
>    However, the prosecutor never argued to the jury that [Griffin's] out-of-court
> statements alone sufficed to prove he was the perpetrator.
>    Moreover, the unchallenged DNA evidence against [Griffin] is strong evidence of
> his guilt, despite his claim that he had consensual sex with the victim.  No evidence
> whatsoever supported his self-serving testimony about repeated consensual sexual
> contact with a woman who did not even give him her phone number.  In light of the
> strong evidence against [Griffin], it is unlikely, improbable, and inconceivable that
> CALCRIM No. 359 misled the jury into finding [Griffin] guilty of murder solely because
> he lied to police about knowing the victim.

*Griffin*, 2015 WL 5460697, at *10.

The Due Process Clause of the Fourteenth Amendment requires the prosecution to prove

every element charged in a criminal offense beyond a reasonable doubt.  *See In re Winship*, 397

U.S. 358, 364 (1970).  "[T]he Constitution does not require that any particular form of words be

used in advising the jury of the government's burden of proof.  Rather, taken as a whole, the

instructions must correctly convey the concept of reasonable doubt to the jury."  *Victor v.*

*Nebraska*, 511 U.S. 1, 5 (1994).  A federal habeas court "must determine whether there was a

reasonable likelihood that the jury understood the instruction to allow a conviction predicated on

proof that was insufficient to meet the requirements of due process."  *Lisenbee v. Henry*, 166

F.3d 997, 999 (9th Cir. 1999) (*citing Ramirez v. Hatcher*, 136 F.3d 1209, 1213 (9th Cir. 1998)).

The question is whether the instruction, when read in the context of the jury charges as a whole, is sufficiently erroneous to violate the Fourteenth Amendment. *Francis v. Franklin*, 471 U.S. 307, 309 (1985). This Court must also assume in the absence of evidence to the contrary that the jury followed those instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the law that jurors follow their instructions"); *see Francis*, 471 U.S. at 323-24 & n.9 (discussing the subject in depth).

In this case, the California appellate court's rejection of this instructional error claim was not objectively unreasonable. Moreover, as the Court of Appeal explained, there is no reasonable likelihood that the jury in applied the challenged instruction in a way that violates the Constitution. *See Estelle*, 502 U.S. at 72–73. The Court also finds reasonable the Court of Appeal's alternate conclusion that, "even assuming error for the sake of argument, it was clearly harmless under any standard," in light of the overwhelming evidence against Griffin. *Id.* at *8. In light of the unchallenged DNA evidence, Griffin demonstrates no reasonable probability of a different result had the trial court not given the *corpus delecti* instruction. Griffin is thus not entitled to relief on this instructional error claim.

2.     *CALCRIM No. 207–Date of Murder Need Not Be Proven*

Griffin additionally claims that the trial court erred in instructing the jury with

CALCRIM No. 207 that the prosecution did not need to prove the exact date of the murder.[6]

According to Griffin, such instruction undercut his alibi defense that the murder occurred

Monday when Griffin was at work.  He claims that the error violated his rights to counsel and to

present a complete defense because it precluded trial counsel from responding to the

prosecution's case.

As the Court of Appeal explained, under California law, CALCRIM No. 207 may not be

given "when the evidence demonstrates that the offense was committed at a specific time and

place and the defendant has presented a defense of alibi or lack of opportunity."  *Griffin*, 2015

WL 5460697, at *11.  The Court of Appeal rejected Griffin's claim that CALCRIM No. 207

could not be given in his case:

> Here, [Griffin] did not have even a partial alibi.  He claims on appeal that the
> prosecution presented evidence that the victim died at about 2:00 a.m. on Monday,
> December 21, 2009, and [Griffin] presented an alibi that he was at work that day from
> 6:10 a.m. until 4:13 p.m.
> There are several problems with [Griffin's] argument.  First, the prosecution's
> evidence did not establish time of death at 2:00 a.m. Monday; rather, the coroner testified
> she could not specify the time of death, and it could have happened as early as 2:00 p.m.
> on Sunday.  The prosecutor told the jury "[w]e will never know" exactly when it
> happened.  [Griffin] could have gone there Sunday, or even Saturday, based on
> unsuccessful attempts by friends to contact the victim and the Sunday newspaper left on
> her porch, and stayed awhile before killing her and leaving.  Second, even if the murder
> happened at 2:00 a.m. Monday, as [Griffin] supposes, [Griffin's] showing up for work in
> Sacramento at 6:10 a.m. Monday is not an alibi for a murder committed in Folsom at 2:00
> a.m. Monday.

---

[6]     The trial court instructed the jury: "It is alleged that the crimes occurred on or
about December 21, 2009.  The People are not required to prove that the crimes took place
exactly on that day but only that they happened reasonably close to that day."

[Griffin's] claim of alibi depends on his insinuation that the killer must have left the victim's home around 10:00 Monday morning, because some neighbors thought they noticed the victim's door closed on Monday morning as late as 10:00 a.m., yet the door was wide open when the victim's body was discovered at 11:50 a.m. Monday. This evidence about the door going from closed to open midmorning Monday neither pinpoints occurrence of the crimes nor affords [Griffin] an alibi defense so as to render improper the "on or about" jury instruction. Even assuming for the sake of argument that the victim's neighbors in the senior housing complex were accurate in their recollections, none of them actually went to the victim's door on Monday morning to enable them to know whether the door was completely closed in a way that would have prevented the victim's cat from opening it. The evidence established the cat's habit of opening the door. [Griffin] argues neither the cat nor wind could have pushed "wide open" the door in the sheltered alcove, but he offers no evidence about behavior of a cat whose mistress was murdered. Although we do not buy into [Griffin's] assumption that the killer must have opened the door between 10:00 and noon on Monday, we nevertheless note [Griffin] offered no independent evidence of his whereabouts during that two-hour time period. Although [Griffin's] supervisor testified [Griffin's] work log showed he started work at 6:10 a.m. Monday morning and worked all day, she also testified [Griffin] himself was the person who filled out that log. Since his job took him on the road, his self-reported log is insufficient alibi for his whereabouts between 10:00 a.m. and 11:50 a.m. on Monday, so as to render erroneous the "on or about" jury instruction.

We conclude the instruction was proper and did not undercut any alibi defense.

*Griffin*, 2015 WL 5460697cnncn, at *12.

The Court of Appeal's conclusion is both reasonable and fully supported by the record. Griffin fails to show error, much less error of constitutional magnitude. He is therefore not entitled to relief on this instructional error claim either.

## V. CONCLUSION AND ORDER

Griffin is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to grant a Certificate of Appealability. *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree

22

with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)). Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals. *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is directed to enter judgment accordingly.

Dated: April 12, 2019.

_____/s/James K. Singleton, Jr._____
JAMES K. SINGLETON, JR.
Senior United States District Judge